IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEVIN SMITH and DAWN SMITH,<br><br>　　　　　Appellants,<br><br>　　v.<br><br>SIPI, LLC and MIDWEST CAPITAL INVESTMENTS, LLC,<br><br>　　　　　Appellees,<br><br>　　and<br><br>HAROLD MOSKOWITZ,<br><br>　　　　　Appellant,<br><br>　　v.<br><br>KEITH SMITH and DAWN SMITH,<br><br>　　　　　Appellees. | Case Nos. 13 C 6422<br>and 14 C 1034<br><br>Hon. Harry D. Leinenweber |

MEMORANDUM OPINION AND ORDER

Before the Court are two appeals arising out of an adversary proceeding in bankruptcy. The first concerns the adversary case itself, in which Plaintiffs Keith Smith and Dawn Smith ("the Smiths") sought to use the fraudulent transfer provision of the Bankruptcy Code, 11 U.S.C. § 548, to avoid the sale of their house pursuant to Illinois tax law. The home had been purchased by Defendant SIPI, LLC ("SIPI") and transferred to Defendant Midwest Capital Investments, LLC ("Midwest"). As explained below, Plaintiffs fail to state a claim under § 548 because they do not

allege any defect in the tax sale conducted under state law. The adversary case should have been dismissed, and the Bankruptcy Court's contrary conclusion is therefore reversed.

In the second appeal, Harold Moskowitz ("Moskowitz"), counsel for SIPI, challenges an order of sanctions entered against him by the Bankruptcy Court. Because the Smiths did not comply with the procedural requirements of Bankruptcy Rule 9011 when they moved for sanctions, the Court lacked the authority to grant the Motion and issue sanctions. Thus, the sanctions imposed on Moskowitz are vacated.

## I. BACKGROUND

### A. Factual and Legal Background

Starting in 1998, the Smiths (then-married) resided in a home in Joliet, Illinois ("the Property") that was owned by Dawn's great-grandfather. On March 25, 2004, Dawn inherited the Property free and clear of any mortgage; however, the Property was encumbered by a tax lien for unpaid real estate taxes for the 2000 tax year.

Under Illinois law, if a judgment is rendered against any property for unpaid taxes, "the county collector shall . . . offer the property for sale." 35 Ill. Comp. Stat. 200/21-190. An Illinois tax sale is a special form of auction that begins the process of transferring the property from the original owner to a person or entity known as a "taxbuyer." At the auction, potential

taxbuyers bid on the lowest monetary penalty that they will accept from the property owner to redeem the property. *Id.* § 21-215. The winning bidder pays the outstanding taxes on the property and receives a certificate of purchase. *Id.* § 21-250. After the sale, the owner may redeem the property within the statutory period by paying the taxes plus the penalty established at the tax sale. *Id.* § 21-355. The owner must also pay any subsequent taxes paid by the taxbuyer (plus interest) and various fees and costs provided by statute. *Id.* This auction process works to the advantage of the owner because competitive bidding drives down the penalty to be paid should the owner seek to redeem the property. *Phoenix Bond & Indem. Co. v. Pappas,* 741 N.E.2d 248, 252 (Ill. 2000) (explaining that the Illinois tax sale provisions were designed "to enable owners to exercise their right of redemption . . . at the lowest possible cost").

If the property owner fails to redeem within the statutory period, the taxbuyer may petition the Illinois circuit court for a tax deed. "The taxbuyer must comply with an array of procedural safeguards, including providing notice of the tax deed proceedings to all occupants, owners and persons interested in the property." *In re Smith,* 614 F.3d 654, 656 (7th Cir. 2010) (internal quotations and citations omitted). After the court issues the tax deed, the purchaser has one year to record the deed in the county recorder's office, otherwise the taxbuyer's rights are "absolutely void." 35

Ill. Comp. Stat. 200/22-85. Grounds for setting aside the tax deed are very narrow – the property owner can challenge the issuance of the deed by appeal from the court issuing the deed or by collateral attack upon proof that (1) the taxes were paid prior to the tax sale, (2) the property was exempt from taxation, (3) the tax deed was procured by fraud or deception, or (4) that a party holding recorded ownership did not receive proper notice. *Id.* § 22-45. If those grounds for challenging the deed are unavailable, the tax deed is "incontestable," at least under state law. *Id.* At the end of the day, if the original owner does not redeem the property, and if the taxbuyer endures the redemption period and fulfills all procedural requirements, the taxbuyer takes title to the property and the transfer is complete.

The delinquent taxes on the Smith residence were offered for sale and purchased by SIPI's predecessor (hereinafter "SIPI") on November 2, 2001. The Smiths failed to redeem the delinquent taxes or pay the subsequent real estate taxes. SIPI applied for a tax deed to the property, which it obtained on April 15, 2005 after it certified that it had satisfied all of the tax sale procedural requirements. SIPI recorded the deed in May of that year and later sold the property to Midwest.

## B.  Prior Proceedings

On April 13, 2007, the Smiths initiated this action by filing an Adversary Complaint against SIPI and Midwest. The Bankruptcy

Court dismissed the Complaint as untimely, and the District Court affirmed. The Seventh Circuit reversed, explaining that the taxbuyer's interest is perfected against *bona fide* purchasers once the tax deed is recorded, and the date of the recording fell within the two-year look back period in § 548. *In re Smith,* 614 F.3d 654, 659 (7th Cir. 2010).

With the Complaint now deemed timely, proceedings resumed in the Bankruptcy Court. But due to a clerical error, nothing happened in that court for five months after the Seventh Circuit issued the mandate. Eventually, SIPI filed a Motion for Status so that it could prosecute its defense of the matter and remove the cloud over its title to the Property. Proceedings resumed in earnest in April 2011. The next month, unbeknownst to SIPI and Midwest, Keith Smith filed a divorce action in the Circuit Court of Will County.

On September 21, 2011, the Bankruptcy Court granted another Motion to Dismiss and allowed the Smiths to replead. Three weeks later, the Smiths filed a Second Amended Adversary Complaint that asserted that both Keith and Dawn were entitled to compensation for the transfer of the house, including for Keith's loss of his homestead exemption. The Complaint's two counts sought (1) to avoid the transfer of the house under § 548 and (2) to obtain relief from Midwest as a transferee of the Property under § 550. Again, SIPI and Midwest moved to dismiss; they argued (1) that the

court lacked jurisdiction under *Rooker-Feldman* to review the state court's judgment, (2) that § 548 does not apply to real estate tax sales, (3) that the Smiths had failed to state a claim under § 550 against Midwest, and (4) that Keith lacked standing because the property was owned by Dawn and a homestead interest alone was insufficient to confer standing.

On December 16, 2011, while the Motions to Dismiss were pending, a divorce decree was entered by the state court in the matter that Keith had filed seven months earlier. Per the decree, any and all rights to proceeds from the Property or this litigation were given to Keith. The Smiths did not inform the Bankruptcy Court or the other parties that Keith claimed an ownership interest in the Property.

The Bankruptcy Court ruled on the Motions to Dismiss on April 5, 2012. The court decided in favor of the Smiths when it held that it had jurisdiction and that the Smiths had stated a claim under § 548 against SIPI and under § 550 against Midwest. The court sided with SIPI, however, in finding that Keith, who had not alleged that he had an interest in the Property, lacked standing.

Discovery commenced. On December 13, 2012, SIPI took Keith's deposition, at which he disclosed for the first time information about the divorce decree and his asserted interest in the Property. Two months later, Dawn appeared telephonically for her deposition

and testified that although she knew of the divorce filing and that the divorce had been granted, she was unaware that Keith claimed to own the proceeds from the Property.

In its Motion for Summary Judgment, SIPI noted that, per the state court divorce decree, Keith was granted sole and exclusive rights to the Property. For that reason, SIPI argued that Dawn lacked an interest in the Property and thus lacked standing. In response, Dawn challenged the validity of the divorce court's assignment to Keith on the ground that the property was hers by reason of inheritance and thus was not marital property. The Bankruptcy Court denied all of the Motions for Summary Judgment on March 13, 2013.

Moskowitz spoke with counsel for the Smiths and brought up the issue of a conflict of interest: both Smiths claimed to own the proceeds from the case. Counsel for the Smiths refused to withdraw. Moskowitz then raised the issue in court, and counsel for the Smiths said that his clients had agreed to proceed for the time and resolve any conflict after the lawsuit with the assistance of their respective divorce counsel. The Bankruptcy Court stated that it thought the issue was a litigation trick by SIPI to delay trial. SIPI responded that the issue had just been revealed (in Dawn's response to the motion for summary judgment), that it had a duty under Illinois law to report the potential conflict, and that the record lacked any evidence of dilatory tactics by SIPI –

indeed, SIPI filed a Motion for Status in early 2011 after proceedings had stalled. SIPI then filed a written Motion to Disqualify that was denied.

On June 5, 2013, the Smiths filed a Motion to rejoin Keith (who had been dismissed for lack of standing) as a party plaintiff. SIPI opposed that motion and argued that, based on the law-of-the-case doctrine, Keith should not be allowed to join. The court granted the motion and the case proceeded to trial that summer. On July 31, 2013, the court issued a memorandum opinion in which it found for the Smiths against SIPI for the amount of $15,000 (one homestead exemption) and sided with Midwest on Count II. A judgment order was entered the next day.

One week later, on August 8, 2013, the Smiths filed a Motion seeking sanctions against Moskowitz for three arguments that he had presented to the court: (1) the contention that the divorce decree divested Dawn of standing, (2) the argument that counsel for the Smiths should be disqualified based on a conflict of interest between Keith and Dawn, and (3) the opposition to the motion to join on the basis of law-of-the-case. For each of those grounds, the Smiths contended that sanctions were warranted because Moskowitz had maintained his arguments even after SIPI had characterized them as frivolous. After the Motion was fully-briefed, the court granted the motion and ordered Moskowitz to pay a fine.

## II.  STANDARD OF REVIEW

A bankruptcy court's "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Mungo v. Taylor,* 355 F.3d 969, 974 (7th Cir. 2004). The bankruptcy court's rulings on questions of law, as well as its resolution of mixed questions of law and fact, are reviewed *de novo*. *Id.*

## III.  ANALYSIS

### A.  Rooker-Feldman

SIPI argues that the bankruptcy court should have dismissed the case for lack of federal jurisdiction.  Under the *Rooker-Feldman* doctrine, federal district courts lack subject-matter jurisdiction to hear "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic. Indus. Corp.,* 544 U.S. 280, 284 (2005). The thrust of the restriction is that federal district courts do not sit in appellate review of state-court judgments – such appeals must be taken through the state system and then to the United States Supreme Court.

In their Adversary Complaint, the Smiths seek to use the fraudulent transfer provision of the Federal Bankruptcy Code, 11

U.S.C. § 548, to invalidate the transfer of their property that resulted from state-court tax foreclosure proceedings. They do not argue that the state court applied state tax foreclosure law improperly or that the state court should not have issued the tax deed. Rather, the Smiths assert that the transfer may be invalidated under the Federal Bankruptcy Code, an issue that was not presented to the state court (nor could it have been, as the Smiths filed for bankruptcy after the state court issued the deed). In other words, whether the tax foreclosure can be undone pursuant to federal bankruptcy law is a federal question that was not addressed in state court. To answer that question, the Bankruptcy Court was asked to exercise original jurisdiction, not sit in appellate review of the state court's judgment on a purely state-law matter. The Bankruptcy Court concluded correctly that the *Rooker-Feldman* doctrine does not apply and that it had jurisdiction.

## B. Fraudulent Transfer

SIPI argues that § 548 does not apply to the sale of delinquent taxes in Illinois. Section 548(a)(1) of the Bankruptcy Code allows a bankruptcy trustee to avoid fraudulent transfers, including both those that were "infected by actual fraud" and those that were merely "constructively fraudulent." *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 535 (1994). At issue in this case is the latter category, under which a debtor will prevail if she

proves that (1) the transfer occurred on or within two years before the date of the filing of the petition, (2) she "received less than a reasonably equivalent value in exchange" for the transfer, and (3) she was insolvent on the date of the transfer or became insolvent because of the transfer. 11 U.S.C. § 548(a). The Seventh Circuit already has determined in this case that the transfer occurred within the two-year look-back window. *In re Smith,* 614 F.3d 654, 660 (7th Cir. 2010). The Bankruptcy Court found that the Smiths had met the insolvency requirement, and SIPI does not dispute that conclusion. Thus, only the "reasonably equivalent value" element is contested.

Analysis of the "reasonably equivalent value" requirement begins with *BFP,* 511 U.S. 531, in which the Supreme Court considered the application of § 548 in the context of a mortgage foreclosure. The Court noted that in many situations "reasonably equivalent value" means "fair market value," so a court can evaluate whether a debtor received "reasonably equivalent value" by comparing the fair market value of the property lost to the amount that the debtor received from the transfer. *Id.* at 545. But the Court rejected fair market value as the benchmark for mortgage foreclosures, stressing that "fair market value presumes market conditions that, by definition, simply do not obtain in the context of a forced sale." *Id.* at 538. Real estate that must be sold to satisfy a mortgage "is simply worth less" than property "that could

be sold at leisure and pursuant to normal marketing techniques." *Id.* at 539. Accordingly, the Court concluded that mortgage debtors are deemed to have received reasonably equivalent value for their foreclosed property, regardless of the amount yielded by the foreclosure sale, "so long as all the requirements of the State's foreclosure law have been complied with." *Id.* at 545.

The *BFP* Court stated that its opinion covered only mortgage foreclosures, as "[t]he considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." *Id.* at 537 n.3. As far as this Court is aware, neither the Seventh Circuit nor any district court has decided whether *BFP* applies to a tax foreclosure conducted pursuant to Illinois law. Bankruptcy Courts in this district are split. *Compare In re Murray,* 276 B.R. 869, 878 (N.D. Ill. 2002) ("*BFP* logically applies to tax sales"), *with In re Butler,* 171 B.R. 321, 326 n.6 (N.D. Ill. 1994) (*BFP* does not apply to tax sales in Illinois because "[u]nlike a foreclosure sale, [Illinois tax sale] bids are in no way based on the value of the subject property").

Across the country, federal circuit and district courts appear to agree generally that *BFP* applies to tax sales. The Fifth Circuit was the first to so hold when it emphasized that both tax sales and mortgage foreclosure are forced sales where the concept of fair market value "is especially inappropriate." *Matter of T.F. Stone Co.,* 72 F.3d 466, 471 (5th Cir. 1995). The court also noted

that, regardless of whether the forced sale is a tax sale or a mortgage foreclosure, courts are ill-equipped to determine "a 'reasonable' or 'fair' forced sale price." *Id.* Finally, the *T.F. Stone* court stressed that "the essential state interest in ensuring 'security of the titles to real estate' is equally salient in both mortgage foreclosure sales and tax sales of real property." *Id.* The Tenth Circuit agrees, at least where the tax sale involves competitive bidding. *In re Grandote Country Club Co.,* 252 F.3d 1146, 1152 (10th Cir. 2001) (extending *BFP* and concluding that a tax sale conducted under Colorado law pursuant to a competitive bidding procedure "constitutes transfer for 'reasonably equivalent value'"). This Court is aware of no circuit or district court holding to the contrary, although bankruptcy courts are split. *Compare In re Samaniego,* 224 B.R. 154, 162 (E.D. Wash. 1998) (applying the rule from *BFP* to a tax sale), *with In re Murphy,* 331 B.R. 107, 120 (S.D.N.Y. 2005) (declining to apply *BFP* to New York's tax forfeiture law).

With no binding precedent on point, this Court returns to *BFP*. The *BFP* Court observed first that reasonably equivalent value does not mean fair market value in the context of a forced sale. *BFP,* 511 U.S. at 537-38. That point applies equally to tax sales and mortgage foreclosures: just as "state foreclosure law permits the mortgagee to sell [the property] at forced sale," Illinois tax law compels the county collector to sell the rights to the property at

a tax sale. *Id.* at 539; 35 Ill. Comp. Stat. 200/21-190. More broadly, both sales involve circumstances that obscure the market value of the property: a mortgage foreclosure involves property that *must* be sold, often on a strict timetable, and an Illinois tax sale involves the sale of rights to property that are not guaranteed to ripen into actual ownership. The Fifth Circuit recognized this similarity between tax foreclosures and mortgage foreclosures when it extended *BFP* to tax sales. *T.F. Stone,* 72 F.3d at 471 (characterizing the tax foreclosure under Oklahoma law as "a forced sale"). The reasoning from *BFP* instructs that fair market value is not an appropriate benchmark for determining reasonably equivalent value in the context of a tax foreclosure.

The inapplicability of fair market value is not the only consideration. The *BFP* Court emphasized that, "[a]bsent a clear statutory requirement to the contrary," the bankruptcy code must be interpreted in harmony with the "state-law regulatory background." *BFP,* 511 U.S. 539-40 ("The existence and force and function of established institutions of local government are always in the consciousness of lawmakers and, while their weight may vary, they may never be completely overlooked in the task of interpretation.") (internal quotation omitted). Of course, there is no question that Congress may regulate bankruptcies, U.S. Const. Art. I, § 8, cl. 4, and that congressional regulation is supreme over state law, U.S. Const. Art. VI, cl. 2. But when confronted with a similar conflict

(between the Bankruptcy Code and state mortgage foreclosure law),
the *BFP* Court scoured the Code for a clear and manifest purpose to
displace state regulation of mortgages and found none.   After
noting the state interest in securing title to real estate through
orderly mortgage foreclosures, the Court observed that mortgage
foreclosure processes "vary considerably from State to State,
depending upon, among other things, how the particular State values
the divergent interests of debtor and creditor."  *BFP,* 511 U.S. at
540.   Accordingly, the Court rejected the idea of setting "a
federal 'reasonable' foreclosure-sale price" because doing so would
"extend federal bankruptcy law well beyond the traditional field of
fraudulent transfers, into realms of policy where it has not
ventured before."  *Id.*

That point resonates here:  Illinois's tax foreclosure rules
form part of the state-law regulatory background that Congress is
presumed to have considered.  Tax sale procedures – just like those
for mortgage foreclosures – vary from state to state, depending on
many factors including the policy judgments of state lawmakers (how
long should the redemption period be, what sort of notice should be
required, and so on).  For both property tax sales and mortgage
foreclosures, the state's regulation helps property owners secure
their title.

In fact, the state's interest in enforcing its property tax
system is more compelling than its interest in facilitating orderly

mortgage foreclosures.  States and municipalities rely on property tax revenue to fund police and emergency personnel, administer public schools, and provide other basic public services – all quintessential state interests.  Because the state interest in securing title to real estate prevented the *BFP* Court from reading § 548 in a way that displaced the state's mortgage foreclosure process, *a fortiori* the state interest in collecting property tax revenue precludes this Court from using § 548 to undo a tax sale that was valid under state law.  *BFP* instructs that, in the absence of a statutory requirement to the contrary, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law."  *Id.* at 544-45; *see also, Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,* 474 U.S. 494, 505 (1986) (bankruptcy trustee must comply with background state laws because "Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers"); *Kelly v. Robinson,* 479 U.S. 36, 49 (1986) (reading federal bankruptcy code not to interfere with fines and orders of restitution imposed by state criminal courts, with deference to "the States' interest in administering their criminal justice systems free from federal interference").

Finally, the *BFP* Court discussed the underpinnings of foreclosure law and fraudulent transfer law, two separate doctrines that, together, balance several important creditor-debtor dynamics.

First, the debtor is protected by the equity of redemption, by which he may redeem property conveyed as security by paying the secured debt after the original due date.  The creditor, in turn, is protected by the foreclosure process, through which he may foreclose the debtor's equity of redemption – that is, after some period of time (the redemption period), he may secure his title by preventing the debtor from redeeming the forfeited property.

Second, the creditor benefits independently from fraudulent transfer rules, which were designed to "invalidate[] covinous and fraudulent transfers designed to delay, hinder or defraud creditors and others."  *BFP,* 511 U.S. at 540 (internal quotation marks omitted).  English courts that developed the principle, and American laws that incorporated it, sought to prevent secret transfers to close relatives or other transfers for "grossly inadequate consideration" when those transfers were calculated to evade repayment of debts.  *Id.* at 540-41.  These rules were separate, and in view of this "peaceful coexistence" of foreclosure law and fraudulent transfer law, the Supreme Court declined to use the latter to set aside a foreclosure sale that was valid under the former – doing so would "disrupt the ancient harmony" of the two doctrines.  *Id.* at 542-43.

These dynamics are no different when the transfer is by means of a tax foreclosure instead of a mortgage foreclosure.  The tax sale process in Illinois – like the mortgage foreclosure process

considered by the *BFP* Court – balances the interests of the parties involved.  The state's interest in collecting its tax revenue is secure, as the revenue from the sale replaces the unpaid taxes. The taxbuyer's interests are accounted for because he either earns a return on his investment (if the owner redeems the property) or acquires the property (if the owner never redeems).  The delinquent taxpayer, meanwhile, is protected by a redemption period, procedural safeguards, and judicial oversight.  In the end, the taxbuyer is supposed to earn rights to the foreclosed property that are "incontestable."  35 Ill. Comp. Stat. 200/22-45.

The Smiths' proposed use of fraudulent transfer rules would wreak havoc on this balance.  The Smiths did not transfer their property to evade creditors; they forfeited it pursuant to state tax law because their property taxes went unpaid.  It is undisputed that SIPI fulfilled all of its obligations under Illinois law and thereby was entitled to own the property.  It would turn the fraudulent transfer statute on its head to use it to allow the debtors to recover property lost years earlier by their own inaction, to the detriment of their creditors.

Nonetheless, Congress has the power to disrupt this historical balance.  The Smiths' Adversary Complaint relies on the premise that Congress has done exactly that:  for the Court to return the Property to the Smiths, the Court would have to use the Bankruptcy Code's fraudulent transfer provision to displace state law of tax

sales, as the transfer to SIPI was already complete under state law when the Smiths filed this action. More bluntly, it is clear that the Smiths cannot succeed without displacing state law because SIPI's right to the property would not really be "incontestable" if it could lose the property in the delinquent taxpayer's subsequent bankruptcy proceedings. But just as with mortgage foreclosures, absent sufficiently clear guidance from Congress that the Bankruptcy Code overrides the traditional balance between state law of tax foreclosures and fraudulent transfer principles, § 548 must be applied in a way that preserves both doctrines. To permit the Smiths to use the fraudulent transfer provision to claw back the Property would interfere with the already-completed tax foreclosure process, making their proposed use of § 548 thoroughly inconsistent with the reasoning in *BFP*. *BFP,* 511 U.S. at 542-43 (explaining that using § 548 "to set aside a foreclosure sale" would have been a "radical departure" from "the ancient harmony [of] foreclosure law and fraudulent conveyance law," one not sanctioned by Congress).

Moreover, the availability of a remedy through bankruptcy for delinquent taxpayers would create a cloud over the taxbuyer's title, a problem that the *BFP* Court sought to avoid. *BFP,* 511 U.S. at 544 (expressing discomfort with the possibility that "[t]he title of every piece of realty purchased at foreclosure would be under a federally created cloud"). In a similar situation, the

Seventh Circuit expressed concern about the effect on title when bankruptcy intervenes following a forced sale. *Matter of Tynan,* 773 F.2d 177, 179 (7th Cir. 1985) (rejecting a rule that "would cloud every title secured through a foreclosure sale due to the possible filing of a voluntary petition in bankruptcy"). Precedent instructs that the effect on title is not to be ignored.

Some courts have seen fit to extend *BFP* to tax sales only where the sale involves competitive bidding. *See, e.g., In re Grandote Country Club Co.,* 252 F.3d at 1152 (opining that "the decisive factor in determining whether a transfer pursuant to a tax sale constitutes 'reasonably equivalent value' is a state's procedure for tax sales," particularly "competitive bidding procedure"). Competitive bidding may be important in a situation where market price helps determine reasonably equivalent value, as competitive bidding can indicate an efficient market. But a tax sale is a forced sale that takes place outside normal market conditions. 35 Ill. Comp. Stat. 200/21-190 (Providing that, after judgment is rendered for unpaid property taxes, "the county collector shall . . . offer the property for sale"). And the Supreme Court has instructed that the concept of "market value . . . has no applicability in the forced-sale context." *BFP,* 511 U.S. at 537.

So although the temptation to do so is great, it simply does not make sense to try to compute a reasonable tax sale price.

Courts are ill-equipped to perform such an audit: "any judicial effort to determine . . . a 'reasonable' or 'fair' forced-sale price . . . would require policy judgments that are inappropriate for courts." *T.F. Stone,* 72 F.3d at 471 (internal quotation omitted). Nor is it sensible for the Court to try to calculate the consideration received by the tax debtor. That sort of analysis would be meaningful only if it managed to account for the public goods provided by the state at no cost to the delinquent taxpayer – another inquiry best left to elected policymakers. *Id.* at 470 (noting that "the *BFP* Court's analysis of § 548 expressly eschewed any consideration of the substantive value received in a forced-sale context"). These principles do not change if the tax sale involves five competitive bidders or only one (whose first bid wins).

Perhaps the biggest problem with scrutinizing tax sales for the specifics of their process (and the value they deliver to the tax debtor) is that it construes federal bankruptcy law to displace state law of tax sales. To measure a state's tax sale rules against the requirements of § 548, the Court would have to place a layer of federally-defined reasonableness on top of the state's regulation. But in the mortgage foreclosure context the *BFP* Court did no such thing; the Court refused to use "the fraudulent transfer provision of the Bankruptcy Code [to] require[] a foreclosure sale to yield a certain minimum price beyond what state

foreclosure law requires." *BFP,* 511 U.S. at 543. This Court discerns no indication that the Bankruptcy Code prescribes anything different in the context of a tax sale. *Id.* at 546 (explaining that "where [Congress's] intent to override is doubtful, our federal system demands deference to long-established traditions of state regulation"); *see also T.F. Stone,* 72 F.3d at 471 (noting "the inappropriateness of using a fair-market-value benchmark as a federally imposed constraint on the ability of states to permit forced sales of real property"). The Court cannot simultaneously interpret the Code to adopt the state-law regulatory background and impose strictures above those required by the State.

To conclude, both mortgage foreclosures and tax sales are "forced sales" where market value cannot inform the determination of reasonably equivalent value. More importantly, applying § 548 of the bankruptcy code to undo a transfer conducted in full compliance with state tax law would disrupt the state regulatory system and subject taxbuyers to a federally-created cloud on their title, results not intended with sufficient clarity by the Bankruptcy Code. And using § 548 to undo a transfer of property that was valid under state tax law would disrupt the historical balance between foreclosure law and fraudulent transfer law. The Bankruptcy Code does not contain any "clear and manifest" indication that Congress intended to override state tax sale law and compel this result. *English v. General Elec. Co.,* 496 U.S. 72,

79 (1990) ("congressional intent to supersede state laws must be 'clear and manifest'"). Thus, a tax creditor is deemed to have received "reasonably equivalent value" for the foreclosed property if all of the state's tax foreclosure laws have been complied with.

Here, it is uncontested that the sale of the Property, and the subsequent issuance of the tax deed by the state court, comported with Illinois law of tax sales. Therefore, the Smiths received reasonably equivalent value for the Property and they cannot obtain relief under § 548. Neither can they recover against Midwest as a subsequent transferee, as that claim depends on the § 548 claim. The Adversary Complaint should have been dismissed for failure to state a claim. In light of this ruling, other points raised in the Smiths' appeal and SIPI's cross-appeal are moot.

## C. Sanctions

Appellant Harold Moskowitz asks the Court to reverse an order of sanctions imposed by the Bankruptcy Court pursuant to Bankruptcy Rule 9011. The decision to impose sanctions is committed to the discretion of the Bankruptcy Court, reviewed only for an abuse of discretion. *Matter of Generes,* 69 F.3d 821, 826 (7th Cir. 1995).

Bankruptcy Rule 9011 – the bankruptcy court's analogue to Rule 11 of the Federal Rules of Civil Procedure, *see Matter of Excello Press, Inc.,* 967 F.2d 1109, 1111 (7th Cir. 1992) – requires candor before the court. By presenting a written motion or other paper to the court, an attorney certifies that:

1. it is not being presented for any improper
   purpose, such as to harass or to cause
   unnecessary delay or needless increase in the
   cost of litigation;

2. the claims, defenses, and other legal
   contentions therein are warranted by existing
   law or by a nonfrivolous argument for the
   extension, modification, or reversal of
   existing law or the establishment of new law;

3. the allegations and other factual contentions
   have evidentiary support or, if specifically
   so identified, are likely to have evidentiary
   support after a reasonable opportunity for
   further investigation or discovery; and

4. the denials of factual contentions are
   warranted on the evidence or, if specifically
   so identified, are reasonably based on a lack
   of information or belief.

Rule 9011(b). Transgressions are punishable by sanction, subject
to several conditions outlined in the Rule. Sanctions may be
initiated by a party's motion, but "[t]he motion for sanctions may
not be filed with or presented to the court unless, within 21 days
after service of the motion (or such other period as the court may
prescribe), the challenged paper, claim, defense, contention,
allegation, or denial is not withdrawn or appropriately corrected."
Rule 9011(c)(1)(A). To impose sanctions on its own motion, the
Court first "enter[s] an order describing the specific conduct that
appears to violate subdivision (b) and directing an attorney, law
firm, or party to show cause why it has not violated
subdivision (b)." Rule 9011(c)(1)(B). Both of these methods for
initiating sanctions provide the offending party with an

opportunity to correct or explain its conduct, whether by withdrawing or amending a written submission or by responding to a show cause order.

Here, the Order of sanctions against Mr. Moskowitz was initiated by a Motion filed by the Smiths on August 8, 2013. The Smiths admit that they did not serve Moskowitz with a copy of the Motion before they filed it, and they concede that they did not abide by the literal text of the Rule. But that is not the end of the analysis: although the text of the Rule indicates that notice must be by service of a draft motion, the Seventh Circuit has explained that "a letter informing the opposing party of the intent to seek sanctions and the basis for the imposition of sanctions . . . is sufficient for Rule 11 purposes." *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago,* 649 F.3d 539, 552 (7th Cir. 2011). To comply substantially with the Rule, the party moving for sanctions must alert opposing counsel to the problem and the intent to seek sanctions, and then give him at least 21 days to desist; "[o]nly if the adverse party maintains its position may the movant inform the court and request sanctions." *Nisenbaum v. Milwaukee Cnty.,* 333 F.3d 808, 811 (7th Cir. 2003).

The Smiths contend that they complied with this understanding of the Rule. They say that when Moskowitz argued that Dawn lost standing by virtue of the divorce decree, the Smiths notified Moskowitz by email, and later argued to the Court, that the

standing argument was false and frivolous because it contradicted Federal Rule of Civil Procedure 25.  After Moskowitz filed a Motion to Disqualify (on the basis that Dawn and Keith had conflicting interests), the Smiths submitted a memorandum that called the motion frivolous.  When presented with Moskowitz's law-of-the-case argument regarding Keith's standing, the Smiths countered that the argument was frivolous because it ignored Federal Rule of Civil Procedure 54(b).  Despite these notices that the Smiths considered his arguments frivolous, Moskowitz stood by his claims and did not withdraw any of his Motions.

The question in this case, then, is whether these notices sufficed for Rule 9011.  It is clear that on several occasions the Smiths accused Moskowitz of advancing frivolous arguments.  There is no indication, however, that the Smiths informed Moskowitz of their intent to seek sanctions.  It is one thing to tell an attorney that he has made a bad argument; it is quite another to threaten him with sanctions if he does not withdraw his argument. The notice mandated by Rule 9011 must "describe the specific conduct alleged to violate subdivision (b)" – the provision requiring candor before the bankruptcy court.  Rule 9011(c)(1)(A). Thus, Rule 9011 requires not just notice than an argument is frivolous but a warning in no uncertain terms that sanctions will be sought unless the offending argument is corrected or withdrawn. It does so for good reason:  if every response brief that

characterized an argument as "false" or "frivolous" or "unsupported" could suffice as notice of the intent to seek sanctions, the 21-day safe-harbor period would be meaningless. So while the Seventh Circuit has relaxed the rule that this notice take the form of a formal draft motion, there is no authority for ignoring the requirement that the notice, whatever its form, inform opposing counsel that his conduct violates Rule 9011.

The Smiths' emails and memoranda may have notified Moskowitz that, in their view, his arguments were frivolous. They may have been correct. But nowhere did they suggest that his conduct "violate[d] subdivision (b)." Nor did they explain the purported basis for any sanctions. The Smiths first disclosed their intent to seek sanctions when they filed their Motion with the court. For that reason, they find little support in *Nisenbaum,* where the party moving for sanctions first sent the lawyer "a letter or demand rather a motion," or in *Matrix,* where the moving party sent "a letter informing the opposing party of the intent to seek sanctions and the basis for the imposition of sanctions." *Nisenbaum,* 333 F.3d at 808; *Matrix,* 649 F.3d at 552. Although the Smiths could have served Moskowitz with a draft version of the motion and waited the required three weeks to file it with the Court, or alternatively sent him a letter or other notice of the intent to seek sanctions, they did neither. It is clear that the Smiths did not comply with the 21-day requirement.

The Smiths attempt to bypass the 21-day requirement by asserting, with no citation to any authority, that "where a frivolous contention is made . . . shortly before trial, it is appropriate, and no abuse of discretion, for the court to either shorten the 21-day period or initiate sanctions on its own initiative so as to not render Rule 9011 vacuous in such circumstances." No. 14-C-1034, ECF No. 14 at 6. The Smiths are correct that a Court may at any time initiate sanctions on its own motion, provided that it follow Rule 9011(c)(1)(B), which includes the requirement that the court enter a show-cause order and allow an opportunity to respond before imposing sanctions. But that method of initiating sanctions is not at issue here. As it applies to this case, the Smiths' assertion contravenes a consensus among courts that compliance with the 21-day period is "a mandatory procedural prerequisite." *In re Soriaga,* No. 00-B-33466, 2001 WL 837918, at *15 (N.D. Ill. July 23, 2001); *see also, In re VMS Sec. Litig.,* 156 F.R.D. 635, 641 (N.D. Ill. 1994) ("Only if the opposing party does not take advantage of the 21–day 'safe harbor' period to correct or withdraw the challenged representation may the party seeking sanctions file the sanctions motion in court."). Thus, it simply cannot be maintained that a court may disregard the Rule's 21-day safe harbor requirement when it is convenient to do so.

Because the Smiths did not comply with the mandatory 21-day waiting period, the Bankruptcy Court lacked the authority to grant

the Motion for Sanctions. "A court that imposes sanctions by motion without adhering to this twenty-one day safe harbor has abused its discretion." *Divane v. Krull Elec. Co.,* 200 F.3d 1020, 1026 (7th Cir. 1999). Therefore, the award of sanctions against Moskowitz is vacated. *See also Johnson v. Waddell & Reed, Inc.,* 74 F.3d 147 (7th Cir. 1996) (Trial court's failure to comply with procedural requirements of Rule 11 constitutes an abuse of discretion, requiring sanction to be vacated); *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1329 (2d Cir. 1995) (Rule 11 sanctions vacated for failure to comply with the Rule's procedural requirements, "particularly . . . the 21-day safe-harbor period").

## IV. CONCLUSION

Because the adversary proceeding should have been dismissed for failure to state a claim, the decision of the Bankruptcy Court is reversed and the case is dismissed. The sanctions imposed against Mr. Moskowitz are vacated.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date:9/22/2014